IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
DELTA DIVISION

TEXAS GAS TRANSMISSION, LLC                                           PLAINTIFF

V.                                          CIVIL ACTION NO. 2:08CV240-B-V

18.08 ACRES +/- IN SOUTHEAST QUARTER OF
SECTION 24, TOWNSHIP 30, NORTH, RANGE 4
WEST, COAHOMA COUNTY, MISSISSIPPI;
AND THE BOARD OF LEVEE COMMISSIONERS
FOR THE YAZOO-MISSISSIPPI DELTA                                       DEFENDANTS

## MEMORANDUM OPINION

This cause comes before the court for ruling after a bench trial held on September 10-12, 2012. After consideration of the testimony, evidence, and exhibits presented at trial and the proposed findings of fact and conclusions of law submitted by the parties, the court is ready to rule and finds as follows:

## The Parties

The plaintiff condemnor Texas Gas Transmission ("Texas Gas") is a limited liability company engaged in the transportation of natural gas in interstate commerce and, as such, is a "natural gas company" under the Natural Gas Act. 15 U.S.C. § 717(b). The defendant Board of Levee Commissioners of the Yazoo-Mississippi Delta ("Levee Board") owns in fee the approximately ninety-eight miles of mainline Mississippi River levee starting just south of Memphis, Tennessee, and running through the Mississippi counties of DeSoto, Tunica, and Coahoma to the Bolivar County, Mississippi line. Part of the ninety-eight miles of levee is a 254.53 acre tract in Coahoma County, which is the subject of this condemnation case.

## **Jurisdiction**

The court has subject matter jurisdiction of this action under 28 U.S.C. § 1331, as the action arises under the laws of the United States, under 28 U.S.C. § 1337, as the action arises under an Act of Congress regulating interstate commerce, and under 15 U.S.C. § 717f(h), which is the eminent domain jurisdictional provision of the Natural Gas Act, 15 U.S.C. §§ 717-717z.

## **The Action**

On May 2, 2008, the Federal Energy Regulatory Commission ("FERC") issued an order granting a Certificate of Public Convenience and Necessity authorizing the construction and operation of an approximately 166-mile interstate natural gas pipeline and related transmission facilities beginning in northern Arkansas and ending near the community of Lula in Coahoma County, Mississippi. The route approved by FERC required the pipeline to cross the Mississippi River and the Mississippi River levees south of Helena, Arkansas, and in Coahoma County.

Texas Gas filed this *in rem* action on November 12, 2008, pursuant to 15 U.S.C. § 717f(h), and Federal Rule of Civil Procedure 71.1, seeking condemnation of a fifty-foot wide, permanent easement across the Levee Board property, consisting of 1.78 acres through which the pipeline runs, and an additional 9.02 acre two-year temporary workspace needed for the construction and maintenance of the pipeline. Shortly thereafter, the parties entered into a permit and agreement for the construction and operation of the pipeline. Upon the parties' motion, the court stayed the action pending an agreement between the parties regarding compensation. The parties were unable to reach an agreement, and the case was restored to the active docket. Texas Gas then filed an amended complaint referencing the permit and agreement and correcting the erroneous legal description of the subject property contained in the original complaint. By the

date of the trial, the pipeline had been constructed and was in operation, and the temporary workspace had reverted to the defendant. The only issue before the court is the proper amount of compensation to which the Levee Board is entitled.

### Findings of Fact

The Texas Gas design and geotechnical engineering team worked with the Levee Board's engineers, Kelly Greenwood and Bill Shepard, and the U.S. Army Corps of Engineers to design the pipeline crossing. Texas Gas project manager and senior design engineer, Michael Smith, directed and oversaw the design and the earthworks to be constructed over the levee. Texas Gas utilized professional engineer David Sauls and his geotechnical engineering firm Louis J. Capozzoli and Associates (now GeoEngineers, Inc.), to test and evaluate the stability of the earthworks design.

Texas Gas's original proposed design of the crossing included the use of horizontal directional drilling, a construction technique that would place the constructed pipeline approximately 150 feet below the levee structure on the Levee Board's property. The Levee Board rejected this design and required that the pipeline be constructed over the top of the levee. Texas Gas presented the Levee Board with a design calling for the pipeline to be constructed directly on top of the levee with approximately three feet of dirt added above the pipeline as cover. This design is a typical pipeline crossing design and has been utilized in various instances, including a natural gas pipeline crossing of the Mississippi River levee in Greenville, Mississippi, and in the very pipeline at issue here where it crosses the western Mississippi River levee south of Helena, Arkansas. This initial design was approved by the U.S. Army Corps of

Engineers, as it satisfied the Corps' design and stability criteria. The Levee Board, however, rejected the design and required a number of modifications.

Levee Board engineer Bill Shepard provided Texas Gas with a crater analysis model and requested that Texas Gas perform calculations of the depth and width of a hypothetical crater which could potentially be formed in the event of a catastrophic rupture of the pipeline. Texas Gas complied and estimated, based on the model, that a potential crater from a hypothetical catastrophic rupture would be 5.1 feet below the bottom of the pipeline and 30.2 feet in diameter, or 15.1 feet on each side of the pipeline. Based on this estimation, the Levee Board then required that the final design of the pipeline crossing maintain a minimum of six feet of fill between the top of the original levee and the bottom of the pipeline and a minimum of four feet of fill placed on top of the pipeline as cover. The Levee Board's stated purpose in requiring this additional fill was to protect the levee itself in the event of a pipeline rupture.

Texas Gas provided several proposed designs incorporating the aforementioned considerations. Shepard then made specific design modifications to the grade and contours of the earthworks in the proposed designs. Included in these modifications was the Levee Board requirement that berms be added to the sides of the levee to provide a slope stability factor of safety of 1.30 or better, which is the U.S. Army Corps of Engineers requirement for slope stability. The final design of the levee pipeline crossing was approved by both the U.S. Army Corps of Engineers and the Levee Board.

After the final design was approved by the Levee Board, the parties entered into a Permit and Agreement for Construction and Operation of Natural Gas Pipeline on November 24, 2008. [Trial Exhibit P-4]. The permit allowed Texas Gas to proceed with construction of the pipeline

in accordance with the approved design. The permit granted Texas Gas the permanent easement and temporary work space to construct, own, and operate the pipeline and also imposed upon Texas Gas certain perpetual obligations including a broad indemnity provision.

The Department of Transportation, Office of Pipeline Safety, regulates interstate natural gas pipeline design, construction, operation, and maintenance. The regulations governing natural gas pipelines are codified at 49 C.F.R. Part 192. Texas Gas Project Manager and Senior Design Engineer, Michael Smith, oversaw the design and construction of the pipeline and earthworks associated with the levee crossing. He testified that this design and construction exceeded requirements of the federal regulations governing natural gas pipelines. For instance, regulations require use of pipe with a wall thickness of .536 inches. Texas Gas designed and constructed the pipeline at issue here with a wall thickness of .750 inches. The court finds that the design of the pipeline meets or exceeds the applicable requirements for the design of interstate natural gas pipelines.

Construction of the additional earthworks in accordance with the final crossing design added thirteen additional feet of height to the levee, with six feet of fill between the 36-inch pipeline and four feet of cover above the pipeline. The six feet of fill beneath the pipeline prevents the pipeline from touching the original levee. The earthworks construction resulted in the addition of over 67,000 cubic yards of fill dirt which was selected by the Levee Board's engineer, Bill Shepard, and taken from the usual source of dirt used by the Levee Board for making repairs and maintaining the levee.

Mr. Smith testified that the pipeline underwent inspections through all phases of the construction process. These inspections demonstrated that the construction of the pipeline met

or exceeded all required specifications. The Levee Board approved the final construction and raised no complaints with Texas Gas related to the design or construction of the crossing with the exception of requiring Texas Gas to re-seed certain areas of the levee with grass seed that did not take initially.

The Levee Board does not dispute that the pipeline crossing met or exceeded applicable federal regulations or that the design and construction of the earthworks was completed in accordance with the designs and specifications required by the Levee Board and the U.S. Army Corps of Engineers. The parties disagree, however, as to whether the construction of the pipeline crossing the levee adversely affects the functionality of the levee for flood control purposes. The court finds that the permanent right of way and temporary work space and the construction of the pipeline crossing the levee do not adversely affect the use of the subject property for agricultural or levee purposes.

The permanent easement acquired by Texas Gas is 1.78 acres. The temporary workspace is 9.02 acres, which includes approximately .92 acres of temporary road access. The subject property for purposes of valuation consists of 254.53 acres of land, improved with a segment of the Mississippi River levee, which runs in a north-south direction through the property. The levee has been in place across the subject property since the early 1900s.

Two twelve inch diameter Texas Gas natural gas pipelines, subject of a prior condemnation, already run across the subject property parallel to and adjacent to the new thirty-six inch Texas Gas pipeline. These two twelve inch pipelines were constructed on top of the original levee with fill placed over them and have been in operation for over fifty years. These

pipelines are located within a 100-foot wide right of way which runs parallel with and adjacent to the 50-foot wide right of way that is the subject of this action.

The subject property's highest and best use, both immediately before and immediately after Texas Gas acquired its right of way on November 24, 2008, is agricultural/levee.

The Levee Board, by virtue of the permit, acknowledges that Texas Gas has the right to condemn and has granted to Texas Gas the permanent easement and temporary workspace for the purpose of constructing the pipeline, subject to various terms and conditions, including Texas Gas' payment of compensation as determined in this action.

The date of taking of the permanent easement and temporary workspace on the property is November 24, 2008, being the date on which Texas Gas was granted access to the property.

The right of Texas Gas to use the temporary workspace has ended, and all rights to the temporary workspace have reverted to the defendant. Texas Gas has no rights in oil, gas, or other minerals. The Levee Board owns one hundred percent of the fee simple interest in the subject property.

## Conclusions of Law

The parties have acknowledged on the record that the only issue in dispute is compensation. The parties do not challenge this court's jurisdiction over this action, do not contest the fact that the Texas Gas pipeline at issue is for a public use, do not contest the description of the subject property, and do not contest that Texas Gas has the right of eminent domain with regard to the permanent easement and temporary workspace as described in the Amended Complaint and the exhibits attached thereto. The court therefore finds that, pursuant to the power granted by 15 U.S.C. § 717f(h) and the Certificate of Public Convenience and

Necessity, and in accordance with the parties' agreements, there being no objections that Texas Gas has the right to enter onto the property or that the pipeline is for a public and necessary purpose, the right of Texas Gas to condemn these interests in land is hereby confirmed, presently and at such other times in the future as Texas Gas, its successors and assigns, may elect, for construction, operation, and maintenance of one pipeline for the transportation of gas for ultimate distribution to the public, along with the rights of ingress and egress along existing roads reasonably necessary for the construction, operation, and maintenance of the pipeline and subject to the terms and conditions set forth in the permit.

Fifth Circuit precedent, as set forth in *Georgia Power Co. v. Sanders*, 617 F.2d 1112 (5th Cir. 1980), requires that state law control the determination of the measure of just compensation in this case. In accordance with Mississippi law, this court has previously ruled in this action that Texas Gas, as condemnor, bears the burden of proof to establish just compensation. *See, e.g., Gulf South Pipeline Co., LP v. Pitre*, 35 So. 3d 494, 498 (Miss. 2010).

Mississippi uses the "before and after rule...to determine the compensation due a landowner when a portion of his property is taken through eminent domain." *Blanton v. Bd. of Supervisors of Copiah County, Miss.*, 720 So. 2d 190, 193 (Miss. 1998). The Mississippi Supreme Court explained this rule in *Miss. State Highway Comm'n v. Hillman*, 198 So. 565 (1940), stating:

> When part of a larger tract of land is taken for public use, the owner should be awarded the difference between the fair market value of the whole tract immediately before the taking, and the fair market value of that remaining immediately after the taking, without considering general benefits or injuries resulting from the use to which the land taken is to be put that are shared by the general public.

8

*Id.* at 569. The three traditional approaches to determining value for real property are: (1) the direct sales comparison or market data approach, which relies on comparable sales, (2) the cost approach, which estimates the cost to replace the property minus depreciation, and (3) the income capitalization approach, which takes actual or estimated net operating income and divides it by a capitalization rate. *See, e.g., Pitre*, 35 So. 3d at 498.

In the case sub judice, Texas Gas and the Levee Board agree that the income capitalization approach is inappropriate for valuing the permanent taking of the appraised property. The Levee Board asserts that the cost approach is the proper method for valuation of a special purpose property like the levee. Texas Gas contends that, while the cost approach is often used to value real property containing an improvement, the improvement on the subject property, the levee, is not affected by the Texas Gas acquisition of the permanent easement and temporary workspace and that, therefore, a direct sales comparison approach, utilizing the values of other agricultural properties, is the appropriate method for determination of compensation in this case.

*Levee Board Approach*

The Levee Board asserts that the cost approach is the only available method for value determination under the facts of this case. Under the cost approach, the unimproved property may be valued by utilization of the sales comparison approach. *See Burks v. Miss. Transp. Comm'n*, 990 So. 2d 200, 204 (Miss. Ct. App. 2008). The improvements are then appraised by determining the replacement or restoration cost of the improvement less depreciation and any form of obsolescence, if appropriate. *Rebelwood, Ltd. v. Hinds County, Miss.*, 544 So. 2d 1356, 1360 (Miss. 1989). The Levee Board contends that the subject property is a special purpose

property and must be valued as such and that the presence of the pipeline has resulted in depreciation which the Levee Board and its appraisal expert characterize as incurable functional obsolescence. According to the Levee Board, the obsolescence here is permanent because the property owner cannot cure it, and this obsolescence reflects diminished desirability of the property.

In formulating his opinion as to value before the taking, the Levee Board's appraisal expert, Mr. Robert Crook, determined that the highest and best use of the property would be as a levee for flood protection for the Mississippi Delta in conjunction with the contiguous levee property to the south. This assessment on an "as if vacant" basis presumed the building of a levee but not an encumbered levee with an allegedly detrimental condition such as a gas pipeline easement running through it.

Employing the cost approach, Mr. Crook first valued the land as if vacant by gathering sales data from twelve sales proximate in time to the November 2008 taking and located along the Mississippi River. He chose four of these sales, all of which were batture land, for forming an opinion of the unimproved land value. Mr. Crook chose batture land sales and not sales of regular land in cultivation because the Levee Board characterizes the appraised property as batture land. Mr. Crook determined that the value of the land as if vacant but to be improved as a levee was $2,800 per acre. Since the appraised property consists of 254.53 acres, the per acre value yielded a total value for the land as of the date of the taking in its before condition of $712,684.

Mr. Crook then addressed valuation of the levee improvement. He used two cost sources to ascertain the specific costs associated with levee construction. He then calculated a cost of

levee construction of $5,000 per linear foot for application to the 5,735 linear feet of levee being appraised.  Mr. Crook determined that total replacement cost new for the levee before taking was thus $28,675,000.  He then deducted ten percent of this number or $2,867,500 for physical deterioration and further found that the previously existing one hundred foot wide easement containing two sixty-year-old Texas Gas pipelines constituted a detrimental condition causing $259,686 in functional obsolescence to the levee.  Subtracting these figures from replacement cost new and adding the land value figure of $712,684 results in a before taking value of $26,260,498.

To calculate the after taking value, Mr. Crook first valued the land itself at $2650 per acre, arriving at a figure of $674,504.  He again used a ten percent deduction for physical deterioration and again deducted $259,686 for the alleged functional obsolescence caused by the existing twelve inch pipeline easement.  Mr. Crook testified that the new fifty foot wide easement, the subject of this case, with a brand new, state of the art, Texas Gas pipeline, caused an additional $3,066,366 in functional obsolescence to the levee, or 11.80 times more depreciation than the older pipelines.  Mr. Crook admitted that he had no market studies or surveys to show a baseline in determining whether the supposed detrimental condition created by the pipeline was benign, which he admitted was a possibility in some circumstances for detrimental conditions under the methodology which he purports to follow created by Mr. Randall Bell, MAI.

Mr. Crook's figures for deterioration and functional obsolescence resulted in a total depreciation figure of $6,193,552.  This figure, subtracted from replacement cost new, resulted in a depreciated cost new of $22,481,448.  Mr. Crook added the land value figure of $674,504,

arriving at an after taking value of $23,155,952.  He also arrived at  figure of $252,480 for the value of the temporary easement on the 9.02 acres of land used during construction of the pipeline.  The difference between Mr. Crook's before and after market value plus this temporary easement figure results in a just compensation value of $3,357,026, which is the amount the Levee Board asks this court to grant.

*Texas Gas Approach*

Texas Gas' appraisal expert, Ms. Lucy Capocaccia, used the direct sales comparison approach to value the property before and after the taking.  She found no damages to the property caused by the taking of the new fifty foot wide easement adjacent to the existing 100 foot wide easement since the new easement can still be crossed with roads, fences, and utilities and can still be used for agricultural purposes including cattle grazing, as can the adjacent 100 foot wide easement.  She further determined that the levee was not adversely affected by the taking, basing this determination on her inspection of the property, her conversations with the engineer who designed the crossing for the new pipeline, her conversations with operations personnel, on her knowledge that the Levee Board had granted the permit for the crossing and the conditions stated in that permit, on her previous work with Texas Gas on this pipeline project, and on her more than twenty years' experience.  Further, she testified that whatever value she estimated for the levee improvement under the cost approach would be the same in the before and after value, so such a valuation would not affect her estimate of just compensation.

Ms. Capocaccia used five local comparable sales of agricultural property in the area ranging in value from approximately $1800 per acre to $3500 per acre.  She valued the property both before and after the taking at $2650 per acre.  This per acre value is the same amount per

acre as that Mr. Crook used in the land values in the after condition.  Ms. Capoccacia's calculation is as follows:

BEFORE VALUE

    254.53 acres @ $2,650/acre =                              $ 674,504.50

AFTER VALUE

    243.73 acres @ $2,650/acre =                    $ 645,884.50

    Plus: 1.78 Acres Imposed With a Permanent
    Pipeline Easement
    1.78 acres x ($2,650 x. 10%) =                   $      471.70

    9.02 Acres Imposed With a Temporary                 .
    Easement
    9.02 acres x $2,650 per acre = $23,903
    $23,903 x 10% rental - $2,390 annual rent
    $2,390 x 1.736 present worth factor*= $4,149

    *Present worth of receiving an annual rent
    income for 2 years @ 10%

    $23,903 - $4,149 =                            $   19,754.00

    Total After Value                              $ 666,110.20

    Difference between Before and After Values:    $    8,394.30
        Plus: Timber Value                   $    3,585.44
                                        $  11,979.74

    ROUNDED TO TOTAL JUST              $ 12,000.00
    COMPENSATION

This court finds that Texas Gas has met its burden of proof to establish the amount of just compensation in this case at $12,000. The court is persuaded by Ms. Cappocaccia's determination that the existence of the easement and pipeline do not adversely affect the levee or the subject property.

The court finds that Mr. Crook's estimation of just compensation in the amount of $3,357,026 is based largely on speculation. The Levee Board failed to establish that the new pipeline caused any physical damage to the levee or caused increased costs in the operation and maintenance of the levee or damaged the land due to increased chance of terrorist attack or rupture of the pipeline at the specific point where it crosses the subject property.

Courts have held that fear of a perceived danger caused by a taking may be admissible when an appraiser uses, among other criteria, comparable sales (or "paired sales analysis") of property both with and without the perceived danger to show the impact on market value. *See, e.g., United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1079 (5th Cir. 1996). Mr. Crook, however, failed to show through market studies or a paired sales analysis that any alleged fear of pipelines affects market value. He provided no sales of levee property because, ostensibly, there are none available. He further admitted that he was unaware of any prospective purchaser of the subject property at the present time. Mr. Crook also admitted that one of the highest and best uses for the property is for potential port facilities – a type of industrial property – and that industrial property developers tout the availability of natural gas to the site as an advantage. The president of the Levee Board also testified that the pipeline provides economic progress.

Rather than basing his opinion on market studies and paired sales analysis, Mr. Crook testified that he used an "implied analysis." He relied on a so-called "hazard zone" of 1700 feet

across the levee, relying on the Levee Board's engineering expert's testimony that a pipeline rupture could cause thermal radiation to extend 850 feet from the pipeline (or 1700 in total width). This expert, Mr. Douglas Chisholm, admitted, however, that any thermal radiation from an unlikely rupture may burn grass along the surface of the levee but that it would not affect the structure of the levee itself. Further, no buildings exist on the levee that would be affected by such an event.

Mr. Crook testified that a potential pipeline rupture was the physical event that formed the basis of his use of the "hazard zone" to calculate the functional obsolescence of the levee attributable to the pipeline. Mr. William Byrd, the pipeline safety engineer testifying on behalf of Texas Gas, calculated that the probability of such a rupture occurring on the Levee Board's property, much less on the levee itself, was one event in every 340,000 years and was, of course, an even more remote possibility during a high water event. The Levee Board was unable to contradict Mr. Byrd's calculation, and both Mr. Crook and Mr. Chisholm admitted that the potential of such a rupture was extremely remote.

Mr. Crook had no market data to quantify the hazard zone's effect on the market value of the levee. Instead, he testified that since the 1700 foot wide hazard zone in the after condition was roughly 36% of the Levee, and applying a 36% factor to that 36% resulted in a roughly 13% diminution in value, then the pipeline caused a 13% diminution in the value of the levee. He articulated no support for the 36% factor, other than he had used a 10% factor in valuing the levee in the before condition where the hazard zone from the existing twelve inch pipelines was 500 feet wide, or 10% of the Levee, and he opined that the affected value grows at a constant ratio. This approach to valuation is simply unsupportable under appraisal principles and the law.

He admitted that using a hazard zone and the proportional increases in the acreage and factors in appraising property was not an appraisal principle of any kind, had not been subject to any peer review, had not been taught by any instructor in appraisal techniques, and was unique to this appraisal. *See Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 41-42 (Miss. 2003) (holding that appraiser's method of using a 750 foot wide buffer zone from the acquired highway right of way to ascertain remainder damages was not printed in textbooks, not taught in seminars, not a principle of any kind, and unique to this appraisal, and should not have been allowed into evidence at trial).

Mr. Crook also used the allegedly changing regulatory environment as a component of his functional obsolescence opinion. The court finds this basis too speculative to be credible. *See, e.g., Scribner Equipment Co., Inc. v. Miss. Transp. Comm'n*, 767 So. 2d 225, 228 (Miss. Ct. App. 2000) (citing *Miss. State Highway Comm'n v. Wagley*, 231 So. 2d 507, 508 (Miss. 1970) (finding that possible changes in regulations must not be considered in determining value if remote or speculative)). The Levee Board also fails to acknowledge that Texas Gas has contractually assumed the risk of such changes by executing the permit with the Levee Board, wherein Texas Gas agrees to alter the pipeline if such regulatory changes require.

Unlike a more typical eminent domain case, the case sub judice presents a situation in which the proposed compensation figures are so divergent that the court does not have the option to arrive at a result which would reflect a compromise between the amounts proposed. The court notes the interesting and imaginative approach employed by the Levee Board to arrive at its proposal for just compensation but concludes that the appraisal methodology utilized lacks supporting precedent, is unsubstantiated, and is based upon the occurrence of highly unlikely

speculative events, and the potential of these events occurring is so remote that it cannot be considered in arriving at a proper measure of just compensation or damages. The court instead finds that the direct sales comparison approach, as employed by the plaintiff, provides the more reasonable measure of just compensation under the facts of this case.

## Conclusion

In accordance with the foregoing findings of fact and conclusions of law, the court finds that a judgment in the total amount of $12,000.00 should be entered against Texas Gas Transmission, LLC, and in favor of the defendant, The Board of Levee Commissioners for the Yazoo-Mississippi Delta, as just compensation for the taking and for any and all damages related to the taking, including, without limitation, timber cleared and removed. The court further finds that interest should accrue at the legal rate. As the parties have stipulated that the only issue before the court is that of just compensation, the court's ruling is limited to that issue, and any other action necessary for the final disposition of this matter shall be resolved by the parties. A separate order in accord with this opinion shall issue this day.

This, the 6th day of December, 2012.


 /s/ Neal Biggers_____
**NEAL B. BIGGERS, JR.**
**UNITED STATES DISTRICT JUDGE**